IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

REGINALD DUNAHUE                                                                    PLAINTIFF
ADC #106911

V.                                Case No. 4:22-CV-00710-BRW-BBM

AUNDREA CULCLAGER, Warden, Cummins
Unit, ADC; KENNETH STARKS, Captain,
Cummins Unit, ADC; and KENNY BOLDEN,
Deputy Warden, Cummins Unit, ADC                                    DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent to

United States District Judge Billy Roy Wilson. You may file written objections to all or

part of this Recommendation. If you do so, those objections must: (1) specifically explain

the factual and/or legal basis for your objection; and (2) be received by the Clerk of this

Court within fourteen (14) days of the date of this Recommendation. If you do not file

objections, Judge Wilson may adopt this Recommendation without independently

reviewing all of the evidence in the record. By not objecting, you may waive the right to

appeal questions of fact.

## I.    INTRODUCTION

On August 8, 2022, Plaintiff Reginald Dunahue ("Dunahue"), then incarcerated at

the Tucker Max Unit of the Arkansas Division of Correction ("ADC"), filed a *pro se*

Complaint pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights

while he was incarcerated at the ADC's Cummins Unit. (Doc. 2) .[1] After the Court screened Dunahue's Complaint in accordance with the Prison Litigation Reform Act ("PLRA") and granted Defendants' Motion for Partial Summary Judgment on the issue of exhaustion, Dunahue was allowed to proceed on failure-to-protect claims against then Warden Aundrea Culclager ("Culclager"), then Captain Kenneth Starks ("Starks"), and then Deputy Warden Kenny Bolden ("Bolden") (collectively, "Defendants"), stemming from his "forced" placement in a restrictive-housing cell with another inmate, who allegedly attacked and attempted to rape Dunahue, (Docs. 14–15, 38, 40).

On August 12, 2024, Dunahue filed a Motion for Summary Judgment and a "Brief in Support of Motion for Summary Judgment with Statements of Genuine Issue of Material Facts & Statement of Disputed Facts, Incorporated." (Docs. 45–46).[2] Defendants filed a Response to Dunahue's Motion for Summary Judgment. (Doc. 58).

On September 11, 2024, Defendants filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Facts. (Docs. 55–57). In response, Dunahue filed a Statement of Disputed Facts,[3] (Doc. 68), and later filed responses to Defendants' Motion for Summary Judgment and Statement of Facts, (Docs. 69, 71, 73, 79). Defendants filed a Reply, (Doc. 75), and the issues are joined and ready for consideration.

---

[1] Dunahue filed what was docketed as a "Supplemental Complaint," consisting of three affidavits discussing incidents that have no relation to this lawsuit. (Doc. 12).

[2] Dunahue's Statement of Facts, as required by Local Rule 56.1(a), is embedded within his Brief in Support of his Motion for Summary Judgment. *See* (Doc. 46 at 13–16).

[3] Dunahue's initial response consists of a series of affidavits and a marked up copy of Defendants' Brief in Support of their Motion for Summary Judgment. *See* (Doc. 68).

For the reasons discussed below, the Court recommends that Dunahue's Motion for Summary Judgment, (Doc. 45), be denied; Defendants' Motion for Summary Judgment, (Doc. 55), be granted; Dunahue's official-capacity claims be dismissed without prejudice; and Dunahue's failure-to-protect claims be dismissed with prejudice.

## II.    FACTUAL BACKGROUND[4]

All parties agree that Dunahue was transferred from the ADC's East Arkansas Regional Unit to the Cummins Unit in late 2019.[5] (Doc. 2 at 6, ¶ 3; Doc. 57 at 3, ¶ 13). On November 22, 2019, Dunahue was placed in restrictive housing. (Doc. 2 at 6, ¶ 5; Doc. 57 at 3, ¶¶ 12, 14). While in restrictive housing, Dunahue shared a cell with inmate Tony Harper ("Inmate Harper"). (Doc. 2 at 6, ¶ 5). On the evening of December 2, 2019, and into the morning of December 3, 2019, while housed together, Dunahue and Inmate Harper had an altercation. (Doc. 2 at 7, ¶ 8; 57 at 4–5, ¶ 27). Non-party Corporal Jessica Mickel ("Cpl. Mickel") witnessed the altercation and "pepper-maced" both Dunahue and Inmate Harper when they failed to heed her orders to release each other. (Doc. 2 at 6, ¶ 7; Doc. 57 at 5, ¶ 30).

---

[4] The sources for these facts are Dunahue's verified Complaint (Doc. 2); Dunahue's Deposition, (Doc. 81-1); Affidavits from Deputy Director of Health Aundrea Culclager, (Doc. 57-1), Deputy Warden Kennie Bolden, (Doc. 57-2), and Captain Kenneth Starks (Doc. 57-3); Dunahue's Motion to Amend, (Doc. 31); Dunahue's Motion for Summary Judgment and attached documentation, (Doc. 45–46); Defendants' Motion for Summary Judgment, (Doc. 55); Defendants' Statement of Disputed Material Facts (Doc. 57); Internal Affairs Investigation Reports, (Doc. 60); Dunahue's Responses, (Docs. 68–69, 71, 73, 79); and Dunahue's Reply (Doc. 78).

[5] Dunahue alleges that "Brickey's prison warden Lay shipped [Dunahue] to Cummins" on October 28, 2019. (Doc. 2 at 6, ¶ 3). Conversely, Dunahue also alleges, "Lay sent me to Cummins on 11-22-2019 & ADC records reflect[] that." *Id.* at 10, ¶ 21. Defendants provided documentation that Dunahue was transferred on November 22, 2019. (Doc. 57-4 at 3).

Almost everything else is disputed. Dunahue alleges that Inmate Harper was a "300 pound homosexual, illegal drug user who was supposed to be isolated from me." (Doc. 46 at 2). Dunahue claims that Inmate Harper assaulted *every* inmate that had ever been housed with him. (Doc. 69 at 5) ("Every inmate Defendants placed in Cummins Unit #311 with I/M Tony Harper,[] before I was forced into #311 with him,[] Harper assaulted them."). Dunahue also alleges that Inmate Harper "was violent[,] dangerous[, and] had a reputation of sexual[ly] assaulting inmates [and] being in possession of deadly weapons and illegal guns." (Doc. 68 at 1). Thus, Dunahue argues that Defendants "were aware of facts from which the inference could be drawn that [Inmate Harper] would beat or rape me."[6] (Doc. 46 at 5). Dunahue asserts that Inmate Harper was a known "serial sex offender" who "did illegal drugs, assaulted inmates often, and would try to rape me." *Id.* at 12. Further, Dunahue alleges that Inmate Harper "was supposed to be in a cell by himself." (Doc. 2 at 6, ¶ 5); *see also* (Doc. 46 at 20–21, 47, 59, 68, 73, 81) (arguing that those in restrictive housing should be housed in one-man cells).

Despite Inmate Harper's reputation, Dunahue claims that Culclager, Starks, and now-terminated defendant Lt. Avery, forced him into the cell with Inmate Harper. (Doc. 2 at 6, ¶ 5). Specifically, Dunahue alleges that Culclager was responsible for allowing him to be housed in the cell with Inmate Harper, (Doc. 46 at 15); Bolden and Starks voted that

---

[6] To support his argument that Defendants were actually aware of the danger posed by placing Dunahue in a cell with Inmate Harper, Dunahue cites to several grievances and documents that are dated *after* the December 2, 2019 altercation. *See* (Doc. 46 at 5) (citing to Doc. 31 at 18–88). In one grievance, Grievance CU-19-01428, Dunahue alleges that "Serg. James" and "Capt. Starks" were aware he would be in danger when they placed him in the cell on November 22, 2019, but provides no *facts* to support that allegation. (Doc. 31 at 23).

Dunahue be assigned to the same cell as Inmate Harper, *id.*, (Doc. 81-1 at 25:6–17); and Starks commanded Avery to place Dunahue in the cell with Inmate Harper, (Doc. 46 at 15; Doc. 81-1 at 27:4–12). Dunahue maintains that, while he was housed with Inmate Harper, Culclager and Bolden "turn[ed] a blind eye" to Harper's drug use. (Doc. 2 at 7, ¶ 8).

With regard to the assault, Dunahue claims that, beginning on December 2, 2019, at around 11 p.m., Inmate Harper began "smoking meth." (Doc. 2 at 6, ¶ 7). Once he was "high," Inmate Harper "tried to rape [Dunahue]." *Id.* Dunahue contends that Inmate Harper then "beat" Dunahue for "20 or 30 minutes" and "tried to break [Dunahue's] left leg." *Id.* As a result, Dunahue claims he suffered a "busted nose" that bled "profusely" and a sore body that lasted three weeks. *Id.*; (Doc. 46 at 3). Dunahue later contends that he attempted to file an emergency grievance prior to the altercation, but his attempt was ignored by non-parties Cpl. Mickel and Sgt. James. (Doc. 31 at 5; 27-3 at 1–2).

Conversely, as a preliminary matter, Defendants attest that, while there are a multitude of two-man cells in restrictive housing at the Cummins Unit, there are only 10 one-man cells. (Doc. 57 at 2, ¶ 6). Those 10 cells are reserved for inmates that "throw bodily fluids or excrement." *Id.* at ¶ 7. Both Dunahue's and Inmate Harper's files were reviewed prior to assigning them to the same cell. (Doc. 57 at 3, ¶ 16). According to Defendants, neither appeared on the other's "enemy list," and there was no evidence that they would be a danger to each other. (Doc. 57-1 at 1, ¶ 5; Doc. 57-2 at 1, ¶ 7; Doc. 57-3 at 2, ¶ 8). Culclager and Starks testified that Inmate Harper was not a violent inmate. (Doc. 57-1 at 1–2, ¶¶ 5–7; Doc. 57-3 at 2, ¶¶ 6, 8). Culclager attested that Inmate Harper was not in restrictive housing for a violent offense; he was placed there because he possessed a

weapon—sharpened wood Inmate Harper claimed he kept for "cutting vegetables." (Doc. 57-1 at 1–2 at ¶ 7). Starks testified that Inmate Harper was an "older inmate" with health issues that was never a problem in restrictive housing prior to the December 2, 2019 altercation. (Doc. 57-3 at 2, ¶ 6). Starks also testified that he was never made aware of Inmate Harper using any drugs prior to the December 2, 2019 altercation. *Id.* at ¶ 10.

Defendants attached as sealed exhibits the internal affairs investigation reports regarding the December 2, 2019 altercation.[7] (Docs. 60-1–60-2). Cpl. Mickels alleged that she was making rounds when she found Dunahue and Inmate Harper, "striking each other with closed fists inside their cell." (Doc. 60-1 at 32). Cpl. Mickels ordered both parties to stop; when they failed to do so, she used O.C. spray and successfully stopped the altercation. *Id.* At that point, Dunahue and Inmate Harper were separated and received medical attention. Inmate Harper was noted to have a "[s]wollen nose from being hit in his face by inmate." (Doc. 60-1 at 21). Likewise, Dunahue had a roughly "5 cm round red/purple bruise [with] moderate swelling to [left] side collarbone," and the skin was not broken. *Id.* at 22. A dentist confirmed that the bruise on Dunahue was a bite mark that did not break the skin. (Doc. 60-2 at 20). After both parties were removed from the cell, the cell was searched; no contraband or weapons were found. (Doc. 60-1 at 7).

After the altercation, Dunahue denied that he needed to be seen by mental health services and reported that Inmate Harper "attempted to rape me." (Doc. 60-1 at 22; Doc.

---

[7] These sealed reports are docketed in a single file; however, to avoid confusion, the court will refer to them as "60-1" for the report titled, "Internal Affairs Investigation 19-2032R Use of Force (Document)," and "60-2" for the report titled, "Internal Affairs Investigation 19-2034R Inmate on Inmate Sexual Harassment (Document)."

60-2 at 19). Inmate Harper denied the allegations and claimed that "Dunahue is lying on me. These are the types of games this inmate plays at every unit he goes to." (Doc. 60-2 at 18). Inmate Harper was a Level 1-C inmate—considered "good"—at the time of the 2019 altercation. (Doc. 57-1 at 1–2, ¶ 7). Incident report logs from the Cummins Unit regarding Inmate Harper show no prior allegations of sexual or physical assault against any inmate. (Doc. 60-2 at 22–24). Inmate Harper does have, however, two reported incidents of indecent exposure from 2013 and two positive drug tests from 2011 and 2018, respectively. *Id.* at 22–23.

On the other hand, between January 5, 2015, and December 2, 2019, Dunahue was suspected of committing sexual misconduct against staff and/or another inmate on 12 occasions; he was allegedly the victim of sexual misconduct on 26 occasions; and he witnessed alleged sexual misconduct on four occasions. (Doc. 60-2 at 40–44). Furthermore, Branham, Cpl. Mickel, and Sgt. James all testified that Dunahue never spoke with them about an emergency grievance on the day of the altercation, nor did Dunahue bring any complaints about Inmate Harper to their attention. (Doc. 60-2 at 31, 33, 35).

Dunahue requests punitive damages and injunctive relief. In particular, Dunahue requests the closure of Cummins' punitive isolation unit, (Doc. 2 at 23), and "somebody . . . tear[ing] down Cummins's Punitive & Admin. Segregation," *id.* at 24.

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial by citing to particular parts of materials in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" *See* FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

In responding to a motion for summary judgment, the nonmoving party may not rely on allegations or denials but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude summary judgment. *Sitzes v. City of W. Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### B.    Dunahue's Motion for Summary Judgment (Doc. 45)

Dunahue filed a Motion for Summary Judgment, alleging that Defendants are not entitled to qualified or sovereign immunity; consequently, the case should proceed to trial. (Doc. 45). Specifically, Dunahue argues: (1) Defendants "wilfully [sic] put me in the position to get sexually assaulted, beat [u]p and [s]eriously injured in a cell by an inmate the defendants deemed to be a threat to other inmates' safety," (Doc. 46 at 1); (2) Defendants were notified of the substantial risk of harm he faced, *id.* at 5; and (3) Defendants are not entitled to sovereign or qualified immunity, *id.* at 13. Dunahue argues that these "genuine issue[s] of material fact" entitle him to a trial. *Id.* at 11.

Attached to Dunahue's Brief in Support are approximately 77 pages of documents, all of which are already part of the case record. (Doc. 46 at 17–94). Defendants' Response and Brief in Support effectively reiterate the arguments made in support of their Motion for Summary Judgment, (Doc. 55). (Doc. 58 at 2, ¶ 6).[8]

### C.    Defendants' Motion for Summary Judgment (Doc. 55)

In their Motion for Summary Judgment, Defendants argue that: (1) sovereign immunity bars Dunahue's claims for monetary relief from Defendants in their official capacities; and (2) Dunahue cannot establish that Defendants violated his constitutional rights; therefore, qualified immunity protects Defendants from Dunahue's claims against them in their individual capacities. (Doc. 55). Specifically, Defendants claim they are entitled to qualified immunity, as they had "no knowledge of any substantial risk of harm

---

[8] Defendants also argue that Dunahue failed to submit a Statement of Facts, as required by Local Rule 56.1. (Doc. 58 at 2). The Court notes, however, that Dunahue's Statement of Facts was embedded within his Brief in Support. (Doc. 46 at 8–16).

to plaintiff, and they were not deliberately indifferent towards plaintiff's needs." *Id*. at 1–2, ¶ 4.

Dunahue filed a Response in the form of 39 pages of affidavits and marked-up copies of Defendants' prior pleadings, arguing that Defendants were aware that Inmate Harper: (1) routinely used and was found in possession of illegal drugs, (Doc. 69 at 7); (2) had sexually assaulted other inmates on "several occasions," *id.*; and (3) had previously been found in possession of a knife, *id.* at 11.

The Court will address Dunahue's official-capacity claims first before turning to Dunahue's individual-capacity claims.

### 1.    Dunahue's Official-Capacity Claims

For the following reasons, the Court recommends that Dunahue's official-capacity claims be dismissed without prejudice. In particular, Dunahue's official-capacity claims for monetary damages are barred by sovereign immunity, and Dunahue's official-capacity claims for injunctive relief should be denied as moot. As a result, the Court recommends that Dunahue's Motion for Summary Judgment, (Doc. 45), be denied, and Defendants' Motion for Summary Judgment, (Doc. 55), be granted on Dunahue's official-capacity claims.

### a.    Monetary Damages

While Dunahue's Complaint requests monetary damages, (Doc. 2 at 24), in response to Defendants' Motion for Summary Judgment, Dunahue alleges that "[m]y official capacity claims against A. Culclager and K. Bolden are brought for the purpose of obtaining injunctive relief only." (Doc. 69 at 3). Regardless, Dunahue's official-capacity

claims against Defendants are the equivalent of claims against the State of Arkansas; consequently, Dunahue's official-capacity claims for monetary damages are barred by the Eleventh Amendment. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kruger v. Nebraska*, 820 F.3d 295, 301(8th Cir. 2016). Defendants are state officials, and the State of Arkansas has not waived its Eleventh Amendment immunity. *Burk v. Beene*, 948 F.2d 489, 493-94 (8th Cir. 1991). Therefore, any claim for monetary damages against Defendants in their official capacity should be dismissed without prejudice. *See Rupp v. Omaha Indian Tribe*, 45 F.3d 1241, 1244 (8th Cir. 1995) ("Sovereign immunity is a jurisdictional question"); *Hart v. United States*, 630 F.3d 1085, 1091 (8th Cir. 2011) (modifying dismissal based on lack of subject-matter jurisdiction to be without prejudice).

### b.    Injunctive Relief

The Eleventh Amendment, however, does not bar official-capacity claims for prospective injunctive relief. *McDaniel v. Precythe*, 897 F.3d 946, 951-52 (8th Cir. 2018) (holding state officials may be sued in official capacity for prospective injunctive relief) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). To qualify for prospective injunctive relief, a violation must be ongoing. *See generally Martin v. Sargent,* 780 F.2d 1334, 1337 (8th Cir. 1985) ("[A] prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions."). Dunahue is no longer housed at the ADC's Cummins Unit, where the alleged constitutional violations took place, and there is no evidence or suggestion in the record that he is, or that he is likely again to be, subjected to Defendants' alleged unlawful actions. As such,

Dunahue's claims for injunctive relief are moot, and Dunahue's official-capacity claims requesting injunctive relief fail, as well.

### 2.    Dunahue's Individual-Capacity Failure-to-Protect Claims

In their Motion for Summary Judgment, Defendants argue they are shielded from liability in their individual capacities by qualified immunity, which protects officials who act in an objectively reasonable manner. (Doc. 55 at 1–2, ¶ 4). For the reasons discussed herein, the Court agrees and recommends that Defendants' Motion for Summary Judgment, (Doc. 55), be granted and Dunahue's Motion for Summary Judgment, (Doc. 45), be denied on Dunahue's individual-capacity failure-to-protect claims.

Qualified immunity may protect a government official from liability when his or her conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

To determine if Defendants are entitled to qualified immunity, the Court must conduct a two-pronged inquiry into whether Dunahue has demonstrated: "(1) a deprivation of a constitutional right, [that was] (2) . . . clearly established at the time of the deprivation." *Robbins v. City of Des Moines*, 984 F.3d 673, 678 (8th Cir. 2021). Whether qualified immunity applies to the case at hand is a question of law, not fact, for the court to decide. *Kelsay v. Ernest*, 933 F.3d 975, 981 (8th Cir. 2019); *McClendon v. Story County Sheriff's*

*Office*, 403 F.3d 510, 515 (8th Cir. 2005). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity should *either* prong be decided in their favor. *Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (citations omitted). Because the Court finds that Dunahue has not demonstrated a deprivation of his constitutional rights, the qualified immunity analysis begins and ends with that prong.

Dunahue's failure-to-protect claims fall under the Eighth Amendment's proscription against cruel and unusual punishment. *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998); U.S. CONST. AMEND. 8. The Eighth Amendment "requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners." *Young v. Selk*, 508 F.3d 868, 872 (8th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The Eighth Amendment does not attach every time one inmate attacks another; rather, prison officials must "exhibit a deliberate or callous indifference to an inmate's safety." *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002) (quoting *Davidson v. Cannon*, 474 U.S. 344, 347 (1986)) (cleaned up); *see also Farmer*, 511 U.S. at 834 ("It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.").

A failure-to-protect claim has both an objective and a subjective component. *Vandevender v. Sass*, 970 F.3d 972, 975–76 (8th Cir. 2020). Dunahue must first illustrate that, objectively, there was a "substantial risk of serious harm to the inmate." *Id.* Dunahue

must then show that the prison officials were deliberately indifferent to the serious risk of harm. *Id.* For a defendant to be found liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

### a.    Substantial Risk of Serious Harm

Under the objective prong, Dunahue must illustrate that the underlying situation—housing Dunahue and Inmate Harper together—"presented a substantial risk of serious harm." *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998). In instances where an inmate is assaulted by an attacker who was known to be a "volatile, dangerous man" or who "previously threatened or fought with the victim," the substantial risk of harm is considered "obvious." *Vandevender*, 970 F.3d at 976 (citing first *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007); *Newman v. Holmes*, 122 F.3d 650, 651 (8th Cir. 1997) then *Everett*, 140 F.3d at 1151; *Prater v. Dahm*, 89 F.3d 538, 540 (8th Cir. 1996); *Jones v. Wallace*, 641 F. App'x 665, 666 (8th Cir. 2016)). Furthermore, if the prison determines that individuals *require* isolation from other inmates, a substantial risk of harm is presumed. *See Newman*, 122 F.3d at 651–53.

Inmate Harper's "conduct . . . is the most probative evidence of the degree and type of risk that [Dunahue] faced." *Young*, 508 F.3d at 872. Inmate Harper was not known to be violent nor volatile. (Doc. 60-2 at 47–48). Dunahue *does* allege, however, that, prior to the December 2, 2019 altercation, Inmate Harper attempted to attack and rape him. (Doc. 69 at 5). Specifically, Dunahue alleges that he tried to file an emergency grievance regarding this December 1, 2019 attack with non-Defendants Sgt. James and Cpl. Mickel. (Doc. 27-

3 at 4).; *see Young*, 508 F.3d at 872 ("the fact that [Plaintiff] promptly reported a threat, asked to be moved immediately, and, when no help was forthcoming, made the same plea the next day, may be *some* evidence of the existence of a risk of harm.") (emphasis added). All the *named* Defendants, however, state that they were not informed by Dunahue (or anyone else) of *any* issues with Inmate Harper. (Doc. 60-2 at 31, 33, 35). Dunahue further admits that he never informed officers of Inmate Harper's drug use prior to the December 2, 2019 altercation. (Doc. 81-1 at 10:14); *see Young*, 508 F.3d at 872 ("[W]e considered a plaintiff's failure to express fear . . . as some evidence that a substantial risk of serious harm did not exist.").

The Court also notes that ADC officials do *not* require isolation between all restrictive housing inmates at the Cummins Unit. (Doc. 57 at 2, ¶¶ 6–7). Isolation is reserved for those inmates that "throw bodily fluids or excrement." *Id.* at ¶ 7. Moreover, restrictive housing is not limited to dangerous offenders. Dunahue cites ADC Administrative Directive 19-28 ("AD 19-28") for the notion that an inmate was required to be a danger to others to be placed in restrictive housing. (Doc. 31 at 93). AD 19-28, however, explicitly states that the policy is to place in restrictive housing those inmates that require "a higher degree of physical control or who staff *otherwise find necessary to remove from the general population of the facility*."[9] (Doc. 31 at 86) (emphasis added). In fact, the "Restrictive Housing Placement Form" states that, "[a]ny placement requires a

---

[9] The policy states later that the "Institutional Classification Committee . . . *may* place an inmate in Restrictive Housing (RH) if his/her continued presence in general population poses a direct threat to the safety of persons or a clear threat to the safe and secure operations of the facility." (Doc. 31 at 86).

finding that this inmate's continued presence in general population poses a serious threat to life, property, self, staff, other inmates, *or* to the security of the Unit." *Id.* at 94 (emphasis added). Finally, individuals can be placed in restrictive housing due to administrative status while they are pending trial, disciplinary court review, investigation, and/or transfer to another unit. *Id.* Therefore, restrictive housing is not limited solely to individuals who are known to be violent or a danger towards other inmates.[10]

Accordingly, Dunahue has failed to show that Inmate Harper constituted a substantial risk of harm to him

### b.    Deliberate Indifference

Even if, however, the Court were to find that there is a genuine issue of material fact regarding whether Inmate Harper constituted a substantial risk of harm to Dunahue, Dunahue has failed to illustrate that Defendants were deliberately indifferent to such a risk. Deliberate indifference is a high threshold that goes well beyond negligence or gross negligence. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010). To establish deliberate indifference, there must be evidence the defendants "recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Shipp v. Murphy*, 9 F.4th 694, 703 (8th Cir. 2021) (emphasis in the original). This level of mental culpability is "akin to criminal recklessness." *Id.* To establish deliberate indifference in failing to protect an inmate from assault by another inmate, Dunahue "'must show that he

---

[10] The Court notes that AD 19-38 does not require inmates to be housed separately; however, even if the policy did require separate housing, "violations of prison policy or regulations alone are not enough to establish deliberate indifference under the Eighth Amendment." *Vandevender*, 970 F.3d at 978.

was faced with a pervasive risk of harm and that the prison officials failed to respond reasonably to that risk.'" *Vandevender*, 970 F.3d at 977 (quoting *Falls v. Nesbitt*, 966 F.2d 375, 378 (8th Cir. 1992)). The Court of Appeals for the Eighth Circuit has stated:

> a "pervasive risk of harm" may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. It is enough that violence and sexual assaults occur with sufficient frequency that prisoners are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures.

*Id.* (quoting *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir. 1991)).

Dunahue claims that Defendants were aware of Inmate Harper's violent history. Specifically, Dunahue alleges that, "Every inmate Defendants placed in Cummins Unit #311 with I/M Tony Harper,[] before I was forced into #311 with him,[] Harper assaulted them," (Doc. 69 at 5); and that Inmate Harper "was violent[,] dangerous[, and] had a reputation of sexual[ly] assaulting inmates [and] being in possession of deadly weapons and illegal drugs," (Doc. 68 at 1). In response, Defendants provided documentation that Inmate Harper has *never* been charged with or convicted of sexually assaulting another inmate. (Doc. 60-2 at 47–48). Likewise, Inmate Harper's last positive drug test was over a year before the December 2, 2019 altercation. (Doc. 60-2 at 47). Defendants concede, however, that Inmate Harper was in restrictive housing for possession of a weapon; specifically, a sharpened piece of wood that was purportedly, according to Inmate Harper, used for cutting vegetables. (Doc. 57-1 at 1–2, ¶ 7). Importantly, in the eleven plus years he had been in ADC custody prior to the altercation, Inmate Harper had never been charged

with or convicted of an act of violence against another inmate.[11] (Doc. 60-2 at 47–49). There is nothing in Inmate Harper's ADC file, nor anything provided by either party, that suggests Inmate Harper was a *known* danger to Dunahue when Defendants put Dunahue and Inmate Harper together in Cell #311.

At the summary judgment phase, Dunahue must "discard the shielding cloak of formal allegations and meet proof with proof." *Fatemi v. White*, 775 F.3d 1022, 1046 (8th Cir. 2015) (quoting *Pace v. Portfolio Recovery Assoc., LLC*, 512 F. App'x 643, 645 (8th Cir. 2013) (per curiam)). Dunahue has failed to do so—Inmate Harper's records show no prior charges of sexual assault, no recent failed drug tests, and *no* acts of violence against any other inmates.

The Court again notes that Dunahue submitted evidence regarding an emergency grievance he attempted to file prior to the December 2, 2019 altercation. Specifically, Dunahue alleges that, on December 2 at approximately 9:30 a.m., he attempted to file an emergency grievance with Sgt. James, warning of the following: "I/M Tony Harper #107334 had been beating me—Dunahue.R. on 12 01-19 & wanted to rape me." (Doc. 27-3 at 4). Dunahue alleges he later informed Cpl. Mickel that he had this grievance and needed a sergeant to sign it. *Id.* Yet, Dunahue does not allege *any* facts to support that this emergency grievance was known to Defendants prior to the altercation. In a later grievance, wherein he discusses his attempt to file this emergency grievance, he explicitly states that

---

[11] The only other battery or assault in Inmate Harper's file is a "Battery of Inmate/Resident With Serious Injury" dated July 27, 2016; however, Inmate Harper is listed as the victim, not the suspect. (Doc. 60-2 at 47).

only non-Defendants Sgt. James and Cpl. Mickel knew of the emergency grievance prior to the altercation.[12] *Id.* Even then, there is no evidence that either Sgt. James or Cpl. Mickel knew the *content* of the grievance.[13] Thus, even if the emergency grievance would have been sufficient to put Defendants on notice, there is no evidence before the Court that Defendants were aware of this emergency grievance prior to Dunahue's altercation with Inmate Harper.[14]

Dunahue also fails to evince that he faced a "pervasive risk of harm" by being housed with Inmate Harper. *Vandevender*, 970 F.3d at 977. While a "reign of violence" is not required to show a pervasive risk, ordinarily, a "pervasive risk of harm" may not "be shown by pointing to a single incident or isolated incidents." *Id.* (quoting *Andrews l*, 929 F.2d at 1330). Taking all evidence in the light most favorable to Dunahue, there is evidence that Culclager was aware that Inmate Harper was found in possession of a weapon on September 30, 2019, which is why he was in restrictive housing at the time of the December 2, 2019 altercation. (Doc. 60-2 at 47). Likewise, as previously stated, Inmate Harper's ADC file shows two incidents of "indecent exposure" over the course of one week in 2013 and a positive drug test in 2018. *Id.* at 47–49. Dunahue testified, however, that he did not inform

---

[12] Dunahue only mentions Defendants to state that Culclager and Bolden put him in danger by housing him with Inmate Harper. *Id.*

[13] Dunahue admits that Sgt. James "refused to read the grievance," and Dunahue simply "told Cpl. Mickel [he] had an Emergency Grievance" and asked him to summon a sergeant to sign it. (Doc. 27-3 at 1).

[14] It is not clear from the record who decided to place Dunahue in the cell with Inmate Harper. *Compare* (Doc. 2 at 6, ¶ 5) (Culclager, Starks, and now-terminated Defendant Avery) *with* (Doc. 2 at 7 ¶ 8) (Culclager, Bolden, and now-terminated Defendant Reed). Starks testified that he did not place Dunahue in the cell with Inmate Harper, although he did agree with the decision to do so. (Doc. 57-3 at 2, ¶7).

any officers of Inmate Harper's alleged regular methamphetamine use, (Doc. 81-1 at 10:14), and that there were no incidents of violence involving with Inmate Harper as the aggressor prior to December 2, 2019, *id.* at 11:5–25. Thus, Inmate Harper's prior incidents of misconduct illustrate "isolated incidents," at best.

In sum, Dunahue has not provided any credible evidence that his altercation with Inmate Harper was anything other than an isolated incident. In fact, there is no evidence that Inmate Harper had ever assaulted any other inmates—either sexually or physically. Nor is there evidence that Dunahue faced physical harm from Inmate Harper on any other occasion, even though Dunahue and Inmate Harper were housed together for over a week before the December 2, 2019 altercation. Furthermore, even if Dunahue did face the threat of physical harm from Inmate Harper before the December 2, 2019 altercation, there is no evidence that Defendants were *aware* of that threat. As such, even assuming Inmate Harper was the aggressor and did attack Dunahue without provocation on the evening of December 2, 2019, Dunahue has failed to show that he faced a pervasive risk of harm from Inmate Harper that Defendants ignored. As the Eighth Circuit has held previously, "Because prisons are dangerous places, housing the most aggressive among us and placing violent people in close quarters, . . . prison officials are entitled to qualified immunity from claims arising out of a surprise attack by one inmate on another." *Vandevender*, 970 F.3d at 976 (citation omitted).

Because Dunahue has not shown a deprivation of his constitutional rights, Defendants are entitled to qualified immunity. *Watson*, 2 F.4th at 1112. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment, (Doc. 55), be granted,

and Dunahue's Motion for Summary Judgment, (Doc. 45), be denied on Dunahue's individual-capacity failure-to-protect claims.

## IV.    CONCLUSION

Based on the record before the Court, the Court recommends that: (1) Dunahue's official-capacity claims for monetary damages be dismissed without prejudice because they are barred by sovereign immunity, (2) Dunahue's official-capacity claims for injunctive relief be dismissed without prejudice as moot, (3) and Dunahue's individual-capacity failure-to-protect claims be dismissed with prejudice because Defendants are entitled to qualified immunity.

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' Motion for Summary Judgment, (Doc. 55), be GRANTED.

2.    Dunahue's Motion for Summary Judgment, (Doc. 45), be DENIED.

3.    Dunahue's official-capacity claims be dismissed without prejudice.

4.    Dunahue's individual-capacity failure-to-protect claims be dismissed with prejudice.

DATED this 26th day of February, 2025.

_____
UNITED STATES MAGISTRATE JUDGE